2004 ND 146

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Scott D. STOCKERT, Defendant and Appellant.**

No. 20030105.

Supreme Court of North Dakota.

July 22, 2004.

James A. Hope, Assistant State's Attorney, Dickinson, N.D., for plaintiff and appellee.

Scott D. Stockert, pro se, Dickinson, N.D., defendant and appellant.

SANDSTROM, Justice.

[¶1] Scott Stockert appeals from a Southwest Judicial District Court criminal judgment finding him guilty of disobedience of a judicial order, a class A misdemeanor, in violation of N.D.C.C. § 12.1–10–05. Stockert argues he received an unfair trial, he was unlawfully extradited from the State of Colorado, he was wrongfully charged under N.D.C.C. § 12.1–10–05, he was precluded from being charged because of double jeopardy, and he was unlawfully sentenced. He also argues the trial judge should have recused himself from this case. We affirm the judgment of the district court.

I

[¶2] Scott Stockert and Wanda Stroud have two minor children. The couple divorced, and custody of the children was awarded to Stroud with Stockert's having visitation rights. On the weekend of September 15, 2000, Stockert had the children for visitation. On September 17, 2000, Stockert failed to return the children to Stroud. He was to have returned the children by 4:00 p.m. that day. On September 25, 2000, Stockert and the children were found in Los Angeles, California.

[¶ 3] On May 3, 2001, a Dickinson police officer signed a complaint charging Stockert with disobedience of a judicial order, a Class A misdemeanor, for violating conditions of visitation found in the divorce court's September 13, 2000, memorandum, the divorce court's January 14, 2000, order amending judgment, and the divorce court's March 24, 1998, judgment.

[¶ 4] On March 11, 2003, Stockert was found guilty by a six-person jury. On April 14, 2003, Stockert was sentenced to one year in prison with all but 154 days suspended for a period of two years if certain conditions and terms were met, including that he comply with treatment recommendations of Dr. Belanger and that he have no contact with Stroud or his children until further court order.

[¶ 5] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal was timely under N.D.R.App.P. 4(b). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. §§ 29–01–12 and 29–28–06.

## II

[¶ 6] Stockert argues the district court denied him his constitutional right to a fair, unbiased, and impartial trial, and to jury selection. He claims he was denied a fair trial because the district court erred in not granting him a jury of more than six people, in not allowing him to challenge and question some of the jurors on their impartiality, in denying his jury instructions, and in denying his right to have subpoenaed witnesses appear in his favor.

## A

[¶ 7] On May 23, 2001, Stockert moved for a jury of nine, and on July 9, 2001, he demanded a jury of twelve. On June 15, 2001, the district court informed Stockert that his request for a jury of nine was

improper. The court did not explain why his request was improper, but referred him to N.D.R.Crim.P. 23(b). The district court instructed him that if he "wishes to request a jury of more than six qualified jurors, [he] is placed on notice that he must file a timely written demand as set forth in the rule." Rule 23(b) provides that in a class A misdemeanor case for which a jury is impaneled, the jury shall consist of six qualified jurors unless a timely demand is made for a jury of twelve. Rule 23(b) further provides that a demand must be filed with the clerk not later than the time set for making pretrial motions. N.D.R.Crim.P. 23(b). On June 6, 2001, Stockert received a notice of assignment of judge, pretrial conference, and trial. Within this notice the parties were informed that "[w]ithin 28 days from the date of this notice, all pretrial motions shall be served and filed with the Court." Stockert signed this notification on June 6, 2001, thus acknowledging he had received a copy of the notice. Twenty-eight days from June 6, 2001, would have been July 4, 2001. Because July 4, 2001, was a holiday, according to N.D.R.Crim.P. 45(a), the pretrial motions were to be served before July 5, 2001. Stockert's certificate of service states that his demand for a jury of twelve was electronically filed on July 6, 2001; however, Stockert's demand was filed with the court on July 9, 2001. His demand for a jury of twelve, whether filed on July 6 or July 9, was untimely.

[¶ 8] Stockert failed to attend the pretrial conference. On July 11, 2002, Stockert was sent a notice of pretrial and trial. Within this notice the parties were again informed that "[w]ithin 28 days from the date of this notice, all pretrial motions shall be served and filed with the Court." The district court administrator certified that a copy of this notice was mailed to or personally served upon Stockert on July

11, 2002. Twenty-eight days from July 11, 2002, would have been August 8, 2002. The pretrial motions, therefore, were to be served by August 8, 2002. On September 11, 2002, Stockert filed another demand for a jury of twelve. On September 13, 2002, at the pretrial conference, the district court denied his demand for a jury of twelve, finding it untimely. Because Stockert's demands for a jury of twelve were untimely, they were properly denied.

### B

[¶ 9] Stockert also argues he was not able to challenge and question five of the seven jurors on their impartiality. The partial transcript of the jury trial shows that during voir dire, the court explained to the jurors, "we'll begin the voir dire process with the Court asking you some basic questions concerning your qualifications. After I'm done then Mr. Stockert will have an opportunity to question you, and then Mr. Hope." The transcript shows the district court allowed Stockert to question the jurors for cause. The district court stated to the jury, "At this point Mr. Stockert is going to be allowed to question you for cause concerning your qualifications." The district court then told Mr. Stockert that he could question the jurors for cause. Stockert questioned one of the jurors. After questioning the juror, Stockert said, "That's all I have. I will not challenge." The court asked Stockert if he passed for cause. Stockert replied, "I pass." The court then allowed Mr. Hope to question the jurors for cause. After Stockert was given the opportunity to question for cause, one juror was excused and another called. The court gave Stockert an opportunity to question the new juror for cause. At no time did Stockert assert that he was not finished questioning the jurors.

### C

[¶ 10] Stockert also argues the district court erred in denying his jury instructions, including the affirmative defenses of duress and entrapment. He claims there was sufficient evidence to support the instructions. This Court has held, the failure to instruct the jury on an applicable defense when there was evidence to support that defense is obvious error. *State v. Hersch*, 445 N.W.2d 626, 634 (N.D. 1989). "In assessing whether a defendant is entitled to jury instructions on a defense, we view the evidence in the light most favorable to the defendant." *Id.* During the trial, Stockert conceded there was no evidence to support his entrapment defense. He stated, "I could see the entrapment part being thrown out because I have no proof that any law enforcement officer installed those devices, so I wouldn't have an objection to that being stricken." N.D.C.C. § 12.1–05–10(1) provides, in part:

In a prosecution for an offense which does not constitute a felony, it is an affirmative defense that the actor engaged in the proscribed conduct because he was compelled to do so by force or threat of force. Compulsion within the meaning of this section exists only if the force, threat, or circumstances are such as would render a person of reasonable firmness incapable of resisting the pressure.

[¶ 11] Stockert claims he was compelled to disobey the judicial order because of threats of force. He claims these threats were demonstrated by a death-threat letter and by his having been assaulted by the mother of his children and her brother. The death-threat letter he discusses was not received into evidence. Further, there was no evidence of assaults presented at trial. Having reviewed the record, we conclude there was insufficient

evidence for the jury instructions of duress and entrapment.

## D

[¶ 12] Stockert claims, because he was indigent, the district court violated his right to have witnesses appear in his favor by means of subpoena. "Whether the district court's refusal to issue a subpoena violates the Sixth Amendment is a question of law, and our standard of review for a claimed violation of a constitutional right is de novo." *State v. Treis*, 1999 ND 136, ¶ 11, 597 N.W.2d 664. "This right is not absolute, and the defendant must show the testimony would have been both favorable and material to his defense." *Id.* The district court informed Stockert it "would sign subpoenas for [him] so that [he] could subpoena whoever [he] wish[ed]." The court did not refuse to issue subpoenas. The court did, however, tell Stockert he would have to pay for the costs himself unless he convinced the court that the witnesses were relevant and necessary. Stockert was then given the opportunity to convince the court that his witnesses were relevant and necessary.

## E

[¶ 13] Stockert also argues he was unlawfully taken from the State of Colorado for a misdemeanor offense. We have been provided with no meaningful record as to what happened in Colorado. If the record on appeal does not allow a meaningful and intelligent review of the alleged error, we decline to review it. *Sabot v. Fargo Women's Health Organization, Inc.*, 500 N.W.2d 889, 892 (N.D.1993); *see also Flattum–Riemers v. Flattum–Riemers*, 2003 ND 70, ¶ 8, 660 N.W.2d 558; *Wagner v. Squibb*, 2003 ND 18, ¶ 5, 656 N.W.2d 674.

## F

[¶ 14] Stockert also argues, because of double jeopardy, the district court could not retry him. He claims he was sanctioned in civil court for the same incident. He argues the State could not lawfully prosecute and convict him of a criminal offense for violating a civil court order. Both civil and criminal sanctions can be imposed for the same act. Furthermore, "a criminal prosecution based on the same conduct that served as the basis for a prior civil contempt proceeding does not offend double jeopardy principles." *State v. Mertz*, 514 N.W.2d 662, 665 (N.D. 1994).

## III

[¶ 15] Stockert also argues the trial judge should have recused himself from this case because he had a conflict of interest and prior knowledge of the case. He claims there was a conflict because Stroud's uncle, Al Tomayo, was the trial judge's campaign manager.

## A

[¶ 16] As a result of a legislatively mandated reduction in the number of district judges, the judgeship occupied by Judge Anderson was eliminated effective December 31, 2000. *See Abolition of Judgeship*, 1999 ND 226, 603 N.W.2d 57. As a result, Judge Anderson was pitted against another sitting judge.

[¶ 17] The divorce case between Stockert and his wife was heard during the described judicial campaign. Judge Anderson was removed from the divorce case because Stockert filed a timely demand for change of judge, and Judge Allan Schmalenberger was assigned to hear the divorce case. *See Stockert v. Stockert*, 2001 ND 160, 639 N.W.2d 706. In the November 2000 election, Judge Anderson won the contested judicial race.

[¶ 18] On May 23, 2001, after Judge Ronald Hilden had been assigned to this criminal case, Stockert filed a timely demand for change of judge, resulting in the removal of Judge Hilden. On June 6, 2001, Judge Anderson was assigned to this case as a result of Stockert's demand for change of judge, and Stockert acknowledged having received notice of Anderson's appointment on that day. On June 15, 2001, Judge Anderson ruled on various pending motions.

[¶ 19] On July 12, 2001, Stockert filed an affidavit of prejudice against Judge Anderson, raising the issue of the propriety of the judge's sitting on the case. In his affidavit, Stockert alleged that Judge Anderson had been removed from the related divorce case because of the alleged conflict of interest, that his ex-wife was a central figure in this prosecution, and that Al Tomayo, his ex-wife's uncle, had been Judge Anderson's campaign manager in the recently completed election. He also alleged that Judge Anderson had prior knowledge of the case because he presided over the contempt of court hearing for the "exact same act" on December 4, 2000. He also claimed the trial judge was a witness in this case because he witnessed in chambers what transpired between two attorneys during the December 4, 2000, hearing. The presiding judge of the district denied the demand on the grounds that it was not timely. Judge Anderson did not recuse.

[¶ 20] Nothing in the record disputes the allegations in Stockert's affidavit: that Stockert had demanded against Anderson in his divorce, that Stockert's ex-wife was a central figure in this prosecution, and that his ex-wife's uncle had recently been Judge Anderson's campaign manager.

### B

[¶ 21] For a long time, the Legislature allowed parties to have a change of judge upon filing an affidavit asserting bias or prejudice on the part of the judge. *Traynor v. Leclerc*, 1997 ND 47, ¶¶ 9, 11, 561 N.W.2d 644. The present procedure, however, allows a party to get a change of judge simply by filing a written demand for change of judge. *Id.* at ¶ 11; *see also* N.D.C.C. § 29–15–21. The written demand must state that it is filed in good faith and not for the purpose of delay. *Traynor*, at ¶ 11. Further, "a party is entitled to a peremptory challenge of an assigned judge, without alleging bias or prejudice." *Id.* In a July 16, 2001, order, the presiding judge of the district informed Stockert that the affidavit of prejudice did not comply with the Rules of Procedure or N.D.C.C. § 29–15–21 and that Judge Anderson was "not disqualified in any manner from proceeding."

[¶ 22] More than a year later, on July 22, 2002, Stockert filed a demand for change of judge. The district court denied the demand as untimely. Although Stockert does not argue the district court erred in denying the demand for change of judge, the demand did not comply with section 29–15–21. "The purpose of [N.D.C.C. § 29–15–21] is to allow a party to obtain a change of judge if the party does not believe he could have a fair and impartial trial before the assigned judge." *Giese v. Giese*, 2002 ND 194, ¶ 5, 653 N.W.2d 663. The right to challenge the assigned judge, however, is not unlimited. *Id.*

[¶ 23] Section 29–15–21(2), N.D.C.C., provides:

> The demand is invalid unless it is filed with the clerk of the court not later than ten days after the occurrence of the earliest of any one of the following events:

a. The date of the notice of assignment or reassignment of a judge for trial of the case;

b. The date of notice that a trial has been scheduled; or

c. The date of service of any ex parte order in the case signed by the judge against whom the demand is filed.

*See also State v. Velasquez*, 1999 ND 217, ¶ 3, 602 N.W.2d 693 (demand found untimely when filed more than ten days after assignment of judge); *Varriano v. Bang*, 541 N.W.2d 707, 712 (N.D.1996). The demand for a change of judge was made over a year after the trial judge had been assigned to the case. Even if Stockert had originally filed the demand for change of judge instead of an affidavit of prejudice, it, too, would have been untimely. In addition, Stockert had already exercised his peremptory challenge. *See* N.D.C.C. § 29-15-21(7).

### C

[¶ 24] To support his argument that the trial judge should have recused himself from this case, Stockert refers to Canon 2 of the North Dakota Code of Judicial Conduct, which requires a judge to avoid impropriety and the appearance of impropriety. N.D.Code Jud. Conduct Canon 2; *see also Farm Credit Bank of St. Paul v. Brakke*, 512 N.W.2d 718, 720 (N.D.1994). Canon 2(A) requires a judge to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary. N.D.Code Jud. Conduct Canon 2(A).

[¶ 25] Stockert also refers to Canon 3 of the North Dakota Code of Judicial Conduct, which requires a judge to disqualify himself in a proceeding in which his impartiality might reasonably be questioned. N.D.Code Jud. Conduct Canon 3(E)(1); *Reems v. St. Joseph's Hospital*, 536 N.W.2d 666, 671 (N.D.1995). A judge is required to disqualify if the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceedings. N.D.Code Jud. Conduct Canon 3(E)(1)(A).

### 1

[¶ 26] Stockert argues the trial judge is a witness in this case because he witnessed in chambers what transpired between two attorneys in a civil contempt hearing held on December 4, 2000. The rule against a judge having prior personal knowledge, however, applies only to knowledge learned from extrajudicial sources. When personal knowledge about a matter has been obtained by a judge within another legal proceeding, disqualification is not called for. Jeffrey M. Shaman, et al., *Judicial Conduct and Ethics* § 4.11, at 127 (3rd ed.2000); *Lee v. State of Indiana*, 735 N.E.2d 1169, 1172 (2000).

### 2

[¶ 27] Stockert also claims the trial judge has a personal interest in seeing him suffer, because of the knowledge he has about the personal conflict. Stockert's claim of actual bias or prejudice appears unsupported by the record. The law presumes a judge is not biased or prejudiced. *Farm Credit Bank of St. Paul v. Brakke*, 512 N.W.2d 718, 720 (N.D.1994). Stockert claims the trial judge has denied every single motion he has filed; however, unfavorable rulings are insufficient to demonstrate bias. *Evenstad v. Buchholz*, 1997 ND 141, ¶ 11, 567 N.W.2d 194. Stockert has failed to establish any instance or evidence of actual bias or prejudice.

### 3

[¶ 28] The remaining question is whether Judge Anderson should have recused—declared his own disqualification—

because the uncle of Stockert's ex-wife had been Judge Anderson's campaign manager in the recently completed campaign in which Judge Anderson had been pitted against another sitting district judge for a single judgeship.

[¶ 29] Even if a trial judge has not shown actual bias or prejudice and his personal knowledge of the facts and circumstances of the case came from a legal proceeding, disqualification can be essential to satisfy the appearance of justice. *Sargent County Bank v. Wentworth*, 500 N.W.2d 862, 877–78 (N.D.1993). The primary concern is the preservation of public respect and confidence in the integrity of the judicial system. *Farm Credit Bank of St. Paul v. Brakke*, 512 N.W.2d 718, 720 (N.D.1994). This confidence and respect can be maintained only if justice satisfies the appearance of justice. *Id.*

[¶ 30] When deciding whether or not to recuse, a judge must determine "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." N.D.Code Jud. Conduct Canon 2(A), Commentary; *see also Farm Credit Bank of St. Paul v. Brakke*, 512 N.W.2d 718, 721 (N.D.1994). "[A] judge is disqualified whenever the judge's impartiality might reasonably be questioned." N.D.Code Jud. Conduct Canon 3(E)(1), Commentary. Recusal is not required, however, in response to "spurious or vague charges of partiality." *Farm Credit Bank*, at 721.

[¶ 31] As we will discuss, in deciding whether a judge should be disqualified because of a person's involvement in a judicial campaign, the relevant factors include:

1. The significance of the person's campaign involvement.

2. Whether the campaign is underway or how recently it ended.

3. Whether there is an ongoing relationship between the person and the judge.

4. The significance of the person's involvement in the current case, including the closeness or remoteness of the involved individual to the case.

5. Whether the issue was promptly raised.

6. Evidence of judicial bias.

[¶ 32] We must decide whether the trial judge's impartiality might reasonably be questioned because Stroud's uncle had been his campaign manager. The trial judge ran for election in November 2000 in a highly contested race between two judges running against each other because one judgeship had been eliminated as part of a court consolidation. Stroud is Stockert's ex-wife. On August 28, 2000, the district court heard Stroud and Stockert's divorce case. The civil case docket reflects that the case was reassigned because of a demand for change of judge. Although Stockert claims the trial judge was disqualified because of this purported conflict of interest, we do not know whether the reasons enumerated in Stockert's affidavit of prejudice were enumerated in that demand. Section 29–15–21, N.D.C.C., does not require reasons for a demand for change of judge.

[¶ 33] The Commentary for North Dakota Code of Judicial Conduct Canon 5(C) states that "campaign contributions of which a judge has knowledge, made by lawyers or others who appear before the judge, may be relevant to disqualification under Section 3E." N.D.Code Jud. Conduct Canon 5(C), Commentary. Campaign contributions include services on a campaign committee and are not limited to financial contributions. *See Na-*

*thanson v. Korvick,* 577 So.2d 943, 944 (Fla.1991).

[¶ 34] In *Reems v. St. Joseph's Hospital,* 536 N.W.2d 666 (N.D.1995), this Court affirmed the trial court's denial of a Rule 60(b)(vi), N.D.R.Civ.P., motion for relief from the operation of the judgment when the trial judge was aware that the lead attorney for the prevailing party in the proceeding before him was to be his campaign finance co-chair when active campaigning was to begin after trial. We said in *Reems:*

> Canon 3(E) requires disqualification of a judge from "a proceeding in which the judge's impartiality might reasonably be questioned." *We do not decide whether in this particular case the trial judge's relationship to the attorney of a party before him or to a partner of a party before him gives reasonable cause to question his impartiality.*
>
> Rule 21 of the North Dakota Rules of Judicial Conduct Commission governs the types of action which that commission may take in order to remedy a violation of the Code of Judicial Conduct. That rule states that "[i]f the Commission finds good cause, it shall recommend to the Supreme Court the censure, removal, retirement, suspension, or other disciplinary action against the judge." Understandably the Code of Judicial Conduct does not specify reversal as a remedy in a case in which a canon was violated.
>
> The Reemses rely on *Sargent County Bank v. Wentworth,* 500 N.W.2d 862 (N.D.1993), to argue that the mere appearance of bias by the trial court requires reversal.
>
> . . . .
>
> This case is distinguishable from *Wentworth* in that questions of fact and the credibility of evidence were decided by a jury. The trial judge made several

decisions involving the evidence which was presented to the jury, but these decisions and other matters of law are a part of the record. Thus we are able to review the record for instances of actual bias.

> . . . .
>
> Contrary to the Reemses' allegations, the record shows that the trial judge conducted a fair trial in which all of the parties were able to fully present their evidence and arguments to the jury. The trial court's denial of the rule 60(b)(vi), N.D.R.Civ.P., motion was not an abuse of discretion.

536 N.W.2d at 671 (emphasis added). As in *Reems,* this case involved a jury as fact finder; unlike *Reems,* the issue was raised before trial.

[¶ 35] Other states have addressed whether there is an appearance of partiality when a relative of someone with a possible interest in the outcome of a case has contributed to a judge's campaign. In *Cook v. State,* 35 Md.App. 430, 371 A.2d 433, 439 (1977), the court found no error in the denial of motion for disqualification of a trial judge when the victim's wife, in a criminal case, had managed the judge's campaign for two weeks. In *Cook,* the judge did not know the victim's wife prior to the campaign and had not seen her since the election. *Id.* The situation in *Cook* is similar to the situation in this case, because a relative of someone with a possible interest in the case worked on the judge's campaign. In *Home Placement Service, Inc. v. Providence Journal Company,* 739 F.2d 671, 675 (1st Cir.1984), the court found no appearance of impartiality when the judge had formerly been the campaign manager for a senator who was a cousin of the director and shareholder of the defendant journal. This case was brought after the election, the judge had never met the director and shareholder,

and the judge had no knowledge of the director's responsibilities and ownership interest in the journal. *Id.* The court found no grounds for recusal. *Id.* It found the link between the senator and his cousin, which was unknown to the judge, "would not raise even an eyebrow of the reasonable person objectively assessing the Judge's impartiality." *Id.*

[¶ 36] Even in situations in which an attorney or a party to a case has contributed to the judge's campaign, some courts have found no appearance of impartiality. In *Gluth Brothers Construction, Inc. v. Union National Bank*, 192 Ill.App.3d 649, 139 Ill.Dec. 650, 548 N.E.2d 1364, 1368 (1989), no appearance of partiality was found when the plaintiff's attorney had previously worked as the judge's campaign manager and the judge failed to disclose that fact. There was no evidence to support an allegation that the attorney had a present, ongoing relationship with the judge, either as his campaign manager or in any other capacity, and the election had taken place six years prior to the case. *Id.* Case law has also suggested a member of a campaign committee is not perpetually barred from appearing before a trial judge. *Barber v. MacKenzie*, 562 So.2d 755, 758 (Fla.Dist.Ct.App.1990). Disqualification may be warranted, however, when the judge's reelection campaign is currently underway. *Caleffe v. Vitale*, 488 So.2d 627, 629 (Fla.Dist.Ct.App.1986).

[¶ 37] In *Kirby v. Chapman*, 917 S.W.2d 902, 909 (Tex.App.1996), the appellate court "reject[ed] the assertion that the fact that [a state Senator] supported [the trial judge's] nomination and appointment to the bench would cast doubt in the mind of a reasonable person about the judge's ability to be fair and impartial, even in a case involving relatives of the Senator."

[¶ 38] Although our recent case of *Graves v. State Board of Law Examiners*, 2004 ND 64, 677 N.W.2d 215, involved the State Board of Law Examiners rather than a judge, it is useful to consider it here. In *Graves*, this Court concluded that a potential conflict of interest existed because the husband of the chairperson of the Board had had acrimonious business dealings with Graves's stepfather. Graves's character was being investigated by the Board. *Graves*, at ¶ 2. In *Graves*, unlike this case and unlike *Reems*, questions of fact and the credibility of evidence were not decided by a jury. In *Graves*, the conflict of interest was related to the factual and legal issues before the Board, the Board chairperson made statements suggesting personal knowledge related to the investigation's subject matter, and the Board chairperson failed to disclose the potential conflict of interest. *Graves*, at ¶¶ 15–16. The types of relationships in *Graves*, in which the chairperson of the Board and her husband and the applicant and her stepfather were involved, differ from those in this case involving a judge and his former campaign manager and an uncle and his niece. The alleged conflict here is substantially more removed than that in *Graves*. A reasonable person would be more likely to perceive that the relationship of the parties in *Graves* could impair the decision-maker's ability to carry out responsibilities with integrity and impartiality.

[¶ 39] In this case, the alleged conflict of interest is wholly unrelated to the factual and legal issues before the judge. We know only that the record reflects Stroud's uncle, Al Tomayo, was the judge's campaign manager. We do not know whether the judge was aware of any connection between Tomayo and Stroud before Stockert brought it to the district court's attention, nor do we know anything about Stroud's relationship with Tomayo or

whether the judge and Tomayo have an ongoing relationship.

[¶ 40] This case is not one in which a party or a party's attorney was involved in the judge's campaign. This is not a case in which the campaign was currently underway, although the campaign had occurred in the relatively recent past. We conclude that under the circumstances of this case, as reflected in the information before us, the judge's impartiality could not be reasonably questioned.

## IV

[¶ 41] We affirm Stockert's conviction.

[¶ 42] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN and CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, concurring and dissenting.

[¶ 43] I concur in parts I and II of the majority opinion. However, I dissent from part III's conclusion that Judge Anderson was not required to recuse himself under the facts of this case. The majority opinion cites *Reems v. St. Joseph's Hospital*, 536 N.W.2d 666 (N.D.1995), for support of its conclusion that Judge Anderson need not recuse himself. In *Reems*, our Court concluded the facts were distinguishable from *Sargent County Bank v. Wentworth*, 500 N.W.2d 862 (N.D.1993), because there "questions of fact and the credibility of evidence were decided by a jury." *Reems*, at 671. I disagree with *Reems* and would reverse it. My position is also based on our Court's recent decision in *Graves v. State Bd. of Law Examiners*, 2004 ND 64, 677 N.W.2d 215. I, therefore, would reverse and remand for a new trial before a different judge.

[¶ 44] With regard to the reasoning in *Reems*, I find it faulty and unsupportable.

Even in a case tried to the court without a jury, the trial judge decides all pre-trial motions, all motions made during and after trial, and all evidentiary decisions. The trial judge has a great deal of discretion with regard to evidentiary rulings, and our Court's standard of review of those rulings is abuse of discretion. In addition, a trial judge can impact a jury by demeanor, facial expressions, and tone of voice. In a criminal case, the trial judge conducts the sentencing and may even fact find if a minimum sentence is required by the state. *See McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). *But see Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (holding the maximum sentence a judge may impose is one based solely on the facts reflected in the jury verdict or admitted by the defendant). I am of the opinion, therefore, that *Wentworth*, 500 N.W.2d 862, controls the analysis of this case and disqualification is mandatory if the judge's impartiality "might" reasonably be questioned.

[¶ 45] I also cannot distinguish this case from *Graves*, 2004 ND 64, 677 N.W.2d 215. In *Graves*, our Court set the standard for disqualification. We stated:

The Code of Judicial Conduct also provides relevant guidelines for disqualification. Canon 3(E)(1)(a) of the Code of Judicial Conduct requires that a judge "shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where ... the judge has a personal bias or prejudice concerning a party ... or personal knowledge of disputed evidentiary facts concerning the proceedings." The Commentary to that rule states, "a judge is disqualified

whenever the judge's impartiality might reasonably be questioned, regardless whether any of the specific rules in Section [3(E)(1) ] apply." The Commentary further provides that "[a] judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification."

These rules on disqualification must also be viewed within the context of Canon 2, which requires that a judge shall avoid impropriety and the appearance of impropriety. Canon 2(A) of the Code of Judicial Conduct specifies that a judge "shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The Commentary to Canon 2(A) clarifies that "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."

. . . .

This Court has addressed a judge's duty to disqualify himself or herself to satisfy the appearance of justice:

> The disqualification directions in Rule 3(C) are not merely guidelines; they are mandatory. Our primary concern is the preservation of public respect and confidence in the integrity of the judicial system, which "can only be maintained if justice satisfies the appearance of justice." *Baier v. Hampton*, 440 N.W.2d 712, 715 (N.D.1989). Even without intentional bias, disqualification can be essential to satisfy the appearance of justice. *Id.*

*Sargent County Bank v. Wentworth*, 500 N.W.2d 862, 877–78 (N.D.1993) (citation omitted). The Court further concluded, reversal of a judgment may be necessary when the judge's impartiality might be questioned:

> A violation of the Rules of Judicial Conduct by the judge who presides over a case can result in the reversal of a judgment. This can occur even when the judge has no actual knowledge of, or inadvertently overlooks, a disqualifying circumstance. Judge Eckert's conduct did not show any intentionally unethical behavior, nor can any be implied in view of the frivolity of the *Williams [v. State*, 405 N.W.2d 615 (N.D.1987) ] litigation. Rather, the record shows beyond question that Judge Eckert fairly tried this case. Nevertheless, the appearance of impropriety is so important to our judicial system that, in the interests of justice, reversal of a judgment may be required even without any intentional bias or impropriety.

*Sargent County Bank*, at 879–80 (citations omitted).

*Graves*, 2004 ND 64, ¶¶ 11–12, 14, 677 N.W.2d 215.

[¶ 46] In *Graves*, the husband of a member of the tribunal allegedly had "acrimonious business dealings with Graves's stepfather" in 1995 and a brother-in-law had a dispute with Graves's stepfather in 1997. 2004 ND 64, ¶ 4, 677 N.W.2d 215. In addition, Graves alleged her stepfather and the husband of a member of the tribunal had disputes in "recent years." *Id.* Graves requested the disqualification in 2003. *Id.* at ¶ 3. In the present case, the uncle of the victim, who is the ex-wife of the defendant, was the campaign manager of the trial judge. The judicial election was in November 2000, and the affidavit of disqualification was filed by the defendant on July 12, 2001, only eight and one-half months post election. Under North Dako-

ta law, a judge's campaign committee can continue to raise money for 90 days following the election. N.D.Code Jud. Conduct Canon 5(C)(2). This judicial campaign was difficult because it pitted one sitting judge against another. The trial judge in this case was the victor in the hard fought election.

[¶ 47] As the majority points out, "[n]othing in the record disputes the allegations in Stockert's affidavit: that Stockert had demanded against Anderson in his divorce, that Stockert's ex-wife was a central figure in this prosecution, and that his ex-wife's uncle had recently been Judge Anderson's campaign manager."

[¶ 48] The ex-wife's uncle's contributions to the trial judge's campaign conceivably ended only a short time before the judge was assigned to the defendant's case. In *Graves*, our Court concluded that the tribunal member's brother-in-law's business dealings in 1997 with the stepfather of a party and her husband's business dealings in 1995 and "recent years" with the stepfather of a party were enough to result in the conclusion that disqualification was necessary and a new hearing before a different hearing panel was required in the interest of justice. 2004 ND 64, ¶ 17, 677 N.W.2d 215. In the present case, the trial judge was apprised of the alleged conflict of interest in July 2001. Yet the trial judge refused to disqualify himself.

[¶ 49] The Court of Appeal of Florida in *Barber v. Mackenzie* pointed out:

The Committee was formed at least one year prior to the election, and plainly contemplates a course of activity on behalf of the judge during the year leading up to the election. There is a substantial and continuing relationship between the Committee and the trial judge, in a matter of great and immediate importance to the judge.... [D]isqualification

is called for here, where there is a continuing affiliation in a joint project lasting a considerable period of time. It is the nature of the relationship which compels this result.

562 So.2d 755, 757 (Fla.Dist.Ct.App.1990). The Court of Appeal of Florida concluded that a reasonable litigant would fear that the trial court would be aware of the activities of his own campaign committee and would entertain a bias in favor of the side with attorneys or parties who were campaign committee members. *Id.* Although Stockert's ex-wife is not the committee member, her uncle is the judge's campaign manager. In *Graves*, the tribunal member did not have any direct conflict with Rebecca Graves. The conflict was between her husband and Graves's stepfather and between her brother-in-law and Graves's stepfather.

[¶ 50] The majority opinion is out of step with the clear message set out in the *Graves* decision that the appearance of impropriety is so important that, in the interests of justice, a reversal of the judgment may be required even without intentional bias or impropriety. 2004 ND 64, ¶ 14, 677 N.W.2d 215.

[¶ 51] In North Dakota, our state trial court judges are elected. The cost of state judicial campaigns is on the rise and threatens the court's independence. *See* ABA Standing Committee on Judicial Independence, *Report of the Commission on Public Financing of Judicial Campaigns*, vi (Feb.2002). In *Republican Party v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the United States Supreme Court held unconstitutional Minnesota's "announce clause" which prohibited judicial candidates from "announcing their views on disputed legal and political issues." *Id.* at 788, 122 S.Ct. 2528. A national survey conducted of registered voters explained the *White* decision and found

that 71 percent of those polled believed that campaign contributions influence judges' decisions. From a nationwide survey of 1,204 adult Americans conducted March 17–19, 2004, by Zogby International for the Justice at Stake Campaign, available at *www.faircourts.org*. The ABA Commission on Public Financing of Judicial Campaigns found "... a pervasive public perception that campaign contributions influence judicial decision-making." *See* ABA Standing Committee on Judicial Independence, *Report of the Commission on Public Financing of Judicial Campaigns*, vi, 18–21 (Feb.2002). One legal scholar has suggested that "[i]f regulations of campaign conduct are invalidated or limited in the wake of *White*, states may respond by beefing up their recusal standards." J.J. Gass, *After White: Defending and Amending Canons of Judicial Ethics*, Brennan Center for Justice at NYU School of Law, 23 (2004). Public trust and confidence in fair and impartial courts is at stake. We must uphold a system that requires recusal when a reasonable basis exists for a party requesting disqualification to doubt the judge's impartiality.

[¶ 52] The record in this case reveals that Judge Anderson was made aware very early in the case of the conflict of interest, that fund-raising for his judicial campaign would have ended approximately in February 2001, only four months before the July 2001 request for disqualification, and that the nature of the judicial race was such that Judge Anderson's judicial position, which he had held for several years, was at stake. I do not believe a judge must recuse automatically because of known campaign contributions infinitely into the future, but I do believe in this case the close timing between the significant contributions to the judge's campaign and the proceeding makes this a case that required recusal.

[¶ 53] On the facts presented, Judge Anderson's impartiality might reasonably be questioned and reasonable minds might find an appearance of impropriety. I would reverse and remand for a new trial.

[¶ 54] Mary Muehlen Maring